UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) ) ) | |
| v. | ) ) | Criminal No. 16-cr-215 (CKK/GMH) |
| JAMES CHERRY, | ) ) ) | |
| Defendant. | ) ) | |

### DETENTION MEMORANDUM

This matter comes before this Court upon an application by the United States that Defendant James Cherry ("Defendant") be detained pending trial. Defendant has been charged by Indictment with two counts of Threatening and Conveying False Information Concerning Use of an Explosive, in violation of 18 U.S.C. § 844(e) and one count of Threatening and Conveying False Information About an Attempt or Alleged Attempt to Use a Destructive Device Against Railroad Carrier Equipment in violation of 18 U.S.C. § 1992(a)(9), (10), and (b)(1). At Defendant's initial appearance on December 19, 2016, the Court granted the government's request for temporary detention pursuant to 18 U.S.C. § 3142(f)(1)(A), (D), and (2)(A), and scheduled a detention hearing with the parties' consent. The undersigned held the detention hearing on December 22, 2016, and, at its conclusion, found that the defendant should be held without bond. This memorandum is submitted to comply with the statutory obligation that this Court submit "written findings of fact and a written statement of the reasons for the detention" as required by section 3142(i)(1) of the Bail Reform Act.

## I.  FINDINGS OF FACT

### A.  The Charged Offenses

At the detention hearing, the United States proceeded by proffer based on the Indictment and offered two exhibits for the Court's consideration: (1) records of Defendant's previous criminal pleas and convictions in Washington, D.C., Florida, and Maryland; and (2) FBI notes from Defendant's statements given during the investigation in this case on August 11, 2016, November 15, 2016, December 5, 2016, and December 16, 2016. The defense offered no contrary evidence on the merits of the offense, nor challenged any aspect of the government's factual proffer. Accordingly, the Court makes the following findings of fact:

Defendant stands charged with placing a series of hoax 911 emergency calls on July 25, 2016 and July 27, 2016 that contained specific threats of imminent bombings directed at property in Washington, D.C., at the National Railroad Passenger Corporation ("Amtrak"), and at travelers at Union Station in Washington, D.C. Specifically, an individual, later identified as Defendant, made the following threats by calling 911 from the same cell phone number:

- On Monday, July 25, 2016, at 6:20 p.m., the caller stated that there were two bombs – one in a building located at 1818 Pennsylvania Avenue and one in a building three blocks away – about to explode. When the emergency operator asked for the name of the caller, he replied "[y]our mama."

- On Monday, July 25, 2016, at 6:31 p.m., the caller stated that "[t]here are bombs, two bombs."

- On Wednesday, January 27, 2016, at 5:06 p.m., the caller spoke indecipherably before stating that "[t]here are eight bombs, eight bombs at Union Station set to go off." The caller then threatened, among other things, that he was going to kill "all you white people."

Immediately after receiving the second July 25, 2016 call, law enforcement called the number back twice and reached a voicemail box for an individual named "James" both times. Further investigation revealed that there is no building located at either 1818 Pennsylvania Avenue in the

Northwest nor Southeast quadrant of Washington, D.C. Rather, 1818 Pennsylvania Avenue, Northwest is the address of a small park. A number of government buildings sit within a three block radius of that address where another bomb was purportedly planted, including the World Bank, at 1818 H Street, Northwest, and, of course, the White House, at 1600 Pennsylvania Avenue, Northwest. The government proffers that law enforcement notified Secret Service of the July 25, 2016 threats.

Following the July 27, 2016 call, which threatened eight imminent bombings at Union Station near the end of a workday in the middle of the week, law enforcement quickly began to evacuate the building. After they emptied Union Station and cordoned off the area, the Metropolitan Police Department and officers in the Metro Transit Canine Unit swept the interior and exterior of the building for explosives and hazardous materials. The Joint Terrorism Task Force was mobilized as well and began an investigation into the threat. Though the sweep, which lasted for at least an hour, uncovered no explosive devices, it delayed over a dozen trains on multiple rail systems. That same day, an Amtrak official dialed the number used to make the bomb threat and left a message instructing the caller – that is, Defendant – to return his call.

Roughly two weeks later, on August 11, 2016, Defendant used the cell phone to return the Amtrak official's call. Defendant revealed that he was at a gas station in Battleboro, North Carolina and was travelling back to Washington, D.C. The FBI immediately dispatched three agents to locate Defendant. The agents identified Defendant at the gas station by calling the cell phone and hearing it ring, and requested to speak with him. After introducing themselves to Defendant and describing the intended nature of their meeting, Defendant claimed that he purchased the cell phone one or two weeks earlier from a man in a homeless shelter in Washington, D.C. One of the agents then played an audio recording of the July 27, 2016 bomb threat, and Defendant denied

making the call or any other calls like it. At the end of the interview, Defendant permitted the FBI agents to take the cell phone for additional examination. On August 22, 2016, the FBI learned that the cell phone had been registered to Defendant as early as March 30, 2016.

FBI agents met with Defendant again on November 15, 2016, this time at a restaurant in Arlington, Virginia. Defendant told the agents that he worked as a tow truck driver and had been living in a homeless shelter for the past month. He also reported to agents that he previously used alcohol and marijuana to cope with frustrations, but that he had been sober for the last several months. In the past, Defendant admitted, he and other homeless individuals would get drunk and make threatening hoax 911-emergency calls on a shared cell phone. In July 2015 specifically, Defendant claimed he called 911 while "high and upset" and falsely reported that eight individuals with backpacks, guns, and rifles were running down the McPherson Square Metro station. Defendant claimed that he thought it would be funny to report the fabricated incident, and said that he watched law enforcement respond at the scene. When the FBI agents explained to Defendant that the procedure for responding to threats like that cause significant disruption for many people, Defendant acknowledged the harm and said that he "just wanted to see everyone react." Defendant claimed that he used words like "bombs," "active shooter," and "guys with guns" in his hoax 911 calls because he knew they would elicit reactions from law enforcement. Agents then proceeded to read transcripts of Defendant's calls to 911 on July 25, 2016, at 6:20 p.m., and on July 27, 2016, at 5:06 p.m. Defendant admitted that he "probably" made those calls, but could not remember them in detail because he was frequently intoxicated when making the hoax calls.

At the end of this conversation, the FBI agents asks Defendant to write out a voluntary confession statement, which he did. In the statement, Defendant acknowledged making the hoax 911 calls from which his current charges stem. He claimed that he was intoxicated and using

marijuana while making the false threats and that he acted alone. He also acknowledged that he may have made similar calls in the past. He made these calls, he wrote, to entertain himself and to see how law enforcement would respond, and expressed remorse for his behavior.

On December 1, 2016, following the grand jury's return of the instant Indictment against Defendant, this Court issued a bench warrant for Defendant's arrest. FBI agents contacted Defendant four days later by calling his cell phone multiple times. He explained that he no longer lived in a homeless shelter and had been living out of his tow truck for the past month. An agent requested to meet Defendant in person at the FBI's Washington Field Office. Defendant agreed but, upon arriving, refused to comply with law enforcement's parking instructions. Instead, he began screaming that he was going to be arrested. Shortly thereafter, he called the FBI agent back and explained that he parked his truck on the street several blocks away and was walking to the Washington Field Office. Defendant, however, never arrived at the FBI office nor answered any of the FBI agent's further calls.

On December 16, 2016, officers with the Metropolitan Police Department executed the Court's bench warrant. During his arrest and without any prompting from law enforcement, Defendant said that he avoided the FBI agent's phone calls because he knew they were trying to arrest him. The government proffered that he also admitted to making a call while intoxicated during which he threatened to detonate explosives at Union Station.

  **B.**  **Pretrial Services' Bond Recommendation**

At Defendant's detention hearing, the Pretrial Services Agency for the District of Columbia ("Pretrial Services") recommended that Defendant be detained pending trial because no conditions or combination of conditions could reasonably assure his appearance or safety to the community. Specifically, a Pretrial Services officer explained that Defendant had no fixed address to report

and a lengthy criminal history that includes, *inter alia*: a non-extraditable warrant related to a stolen vehicle charge in California; an April 8, 2015 trespassing conviction in Florida; a February 3, 2011 Bail Reform Act conviction, prison breach conviction, and conviction for assault on a police officer in Washington, D.C.; a March 16, 2007 second-degree assault conviction in Maryland; and an August 24, 1990 second-degree homicide conviction in Florida. According to defense counsel, Defendant was charged with prison breach in 2011 after absconding from a halfway house. Additionally, the Pretrial Services officer reported that Defendant has been the subject of six bench warrants since 2009. Finally, and in response to this Court's inquiry into the best methods to restrict Defendant's ability to continue making hoax 911-emergency calls, the Pretrial Services officer indicated that Pretrial Services could not reliably police Defendant's telephone use were he released, and that any form of supervised release, including release to a halfway house, would provide Defendant with access to a telephone.

## II.   LEGAL STANDARD

The Bail Reform Act of 1984, 18 U.S.C. § 3142 *et seq.*, provides, in pertinent part, that if a judicial officer finds by clear and convincing evidence that "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community, such judicial officer shall order the detention of the [defendant] before trial." 18 U.S.C. § 3142(e). Thus, even absent a flight risk, danger to the community alone is a sufficient reason to order pretrial detention. *United States v. Salerno*, 489 U.S. 739, 755 (1987); *see also United States v. Perry*, 788 F.2d 100, 113 (3d Cir. 1986); *United States v. Sazenski*, 806 F.2d 846, 848 (8th Cir. 1986). Where the judicial officer's justification for detention is premised upon the safety of the community, the decision must be supported by "clear and convincing evidence." 18 U.S.C. § 3142(f). Where the justification for detention is the judicial officer's finding that no set of conditions will assure the defendant's appearance in court, such a decision

must be supported by a preponderance of the evidence.  *See United States v. Simpkins*, 826 F.2d 94, 96 (D.C. Cir. 1987).

Through the Bail Reform Act, Congress has instructed that a judicial finding of probable cause to believe that a defendant has committed certain types of offenses – including any federal crime of terrorism listed under 18 U.S.C. § 2332b(g)(5)(B) punishable by a term of imprisonment of ten years or more – gives rise to a rebuttable presumption that the defendant constitutes a danger to the community and that no pretrial release condition or combination of conditions may be imposed to reasonably assure the appearance of the person as required or the safety of the community if he were released.  *See* 18 U.S.C. § 3142(e); *see also United States v. Mosuro*, 648 F. Supp. 316, 318 (D.D.C. 1986) (holding that a grand jury indictment established probable cause sufficient to create a rebuttable presumption under section 3142(e)).

Once the rebuttable presumption is triggered, it imposes a burden of production on the defendant "to offer some credible evidence contrary to the statutory presumption."  *See United States v. Alatishe*, 768 F.2d 364, 371 (D.C. Cir. 1985).  As this Court recently emphasized, "[w]hile the burden of production may not be heavy, the applicable cases all speak in terms of a defendant's obligation to introduce 'evidence.'"  *United States v. Lee*, --- F. Supp. 3d ---, 2016 WL 3659892, at *3 (D.D.C. July 1, 2016) (citations omitted).  Thus, some actual evidence and not mere speculation must be offered to rebut the presumption.  In the face of the presumption, which "reflects Congress's substantive judgment that particular classes of offenders should ordinarily be detained prior to trial," a defendant "should 'present all the special features of his case' that take it outside 'the congressional paradigm[.]'"  *United States v. Stone*, 608 F.3d 939, 945–46 (6th Cir. 2010) (quoting *United States v. Jessup*, 757 F.2d 378, 387 (1st Cir. 1985)); *see also United States v. Bess*, 678 F. Supp. 929, 934 (D.D.C. 1988) (finding that the presumption "represents Congress' general

factual view about the special flight risks and the special risks of danger to the community presented by defendants who commit the crimes to which it attaches").

That said, the burden of persuasion on the issue of detention remains, as always, with the government. *United States v. Mercedes*, 254 F.3d 433, 436 (2d Cir. 2001). But even where the defendant offers evidence to rebut the presumption, the presumption is not erased. Rather, the "presumption is incorporated into the other factors considered by this Court in determining whether to grant a conditional release and is given substantial weight." *United States v. Ali*, 793 F. Supp. 2d 386, 391 (D.D.C. 2011); *United States v. Dominguez*, 783 F.2d 702, 707 (7th Cir. 1986) (recognizing that the section 3142(e) presumption does not disappear when rebutted, but "remains in the case as an evidentiary finding militating against release, to be weighed along with other evidence relevant to factors listed in § 3142(g)").

### III.   ANALYSIS

#### A.   Application of the Rebuttable Presumption

The government maintains that Defendant is subject to pretrial detention pursuant to 18 U.S.C. § 3142(f)(1)(A), (1)(D), and (2)(A) because the charged offenses include a federal crime of terrorism punishable by a term of imprisonment greater than ten years and because Defendant poses a serious risk of flight. Based on the arguments raised before the Court at the detention hearing, there appears to be no dispute that the third count in the instant Indictment – Threatening and Conveying False Information about an Attempt or Alleged Attempt to Use a Destructive Device against Railroad Carrier Equipment, in violation of 18 U.S.C. § 1992(a)(9), (a)(10), and (b)(1) – qualifies as a federal crime of terrorism for purposes of 18 U.S.C. § 2332b(g)(5)(B) or is punishable by a twenty-year term of imprisonment. It thus gives rise to a rebuttable presumption of dangerousness and fugitivity.

In response to the presumption, Defendant submits that, while serious, his charged conduct resulted in no physical harm to anyone; law enforcement's sweep of Union Station based on Defendant's false threats returned no weapons or explosive devices.  In lieu of pretrial detention, Defendant asks the Court to place him under supervised release at a halfway house in Washington, D.C.  In that setting, Defendant suggests he will be better able to maintain his sobriety and employment.  Additionally, to assuage any concerns the Court might have that Defendant will return to his past behavior, he offers to work with Pretrial Services to ensure that he has no access to telephones.

Having heard the government's proffer, the Court finds that Defendant has failed to rebut the presumption of dangerousness raised by his charges.  Specifically, the Court finds that placement in a halfway house, even under supervised release, would be wholly unsuitable for Defendant based on the record before it.  For one, the Court is unconvinced that Defendant's placement at a halfway house would reduce his access to a telephone – the most important means of his charged criminal conduct – in any meaningful way.  Given the widespread accessibility of telephones, and considering Pretrial Services' indication that, if Defendant were to continue working, he would be unmonitored during working hours, the Court finds that Defendant will have little difficulty finding a telephone to report threats of imminent bombings around the Washington, D.C. area.  Moreover, Defendant's criminal history, which includes a prison breach charge arising out of an incident where he walked away from his court-ordered residence at a halfway house, leaves the Court with little confidence that he would remain at a halfway house were he so placed.  Finally, and despite Defendant's suggestion to the contrary, the Court finds that Defendant's charged conduct is in fact dangerous.  Indeed, Defendant's bomb threat to Union Station, regardless of its veracity, resulted in a large scale reaction from law enforcement that put others at risk and wasted resources that

could otherwise be spent protecting the District from actual acts of terrorism. Without more, the Court finds that Defendant has not met his burden of production to produce some credible evidence contrary to the statutory presumption of dangerousness. As a result, Congress's assessment, as expressed in the presumption, of the danger posed to the community by individuals charged with federal crimes of terrorism must be respected and is itself sufficient reason alone to hold the defendant without bond pending trial in this matter. *See Alatishe*, 768 F.2d at 371; *see also United States v. Bess*, 678 F. Supp. 929, 934 (D.D.C. 1988) (presumption "represents Congress's general factual view about the special flight risks and the special risks of danger to the community presented by defendants who commit the crimes to which it attaches").

### B.     Application of the Section 3142(g) Factors

Even had Defendant rebutted the presumption, the Court would still find that he should be detained during the pendency of this case. In determining whether there are conditions of release that will reasonably assure the appearance of the person as required and the safety of any other person and the community, the Court considers: (1) the nature and circumstances of the offense; (2) the weight of the evidence against the defendant; (3) the history and characteristics of the defendant; and (4) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release. 18 U.S.C. § 3142(g). Further where, as here, a rebuttable presumption applies, the Court should give the presumption "substantial weight" in the section 3142(g) analysis even if the defendant has met his or her burden of providing some credible evidence to the contrary. *Ali*, 793 F. Supp. 2d at 291. As demonstrated below, a weighing of all of these factors compels the conclusion that Defendant should be detained pending trial.

### 1. *Nature and Circumstances of the Charged Offenses*

The first factor, the nature and circumstances of the charged offenses, favors detention. The defendant is charged with a very serious federal crime of terrorism under 18 U.S.C. § 1992(a). Reflecting the seriousness of that charge is the possible twenty-year term of incarceration he faces if found guilty of that offense. Though Defendant may have enjoyed seeing law enforcement respond to his hoax 911 emergency calls, they were not childish pranks. They threatened major acts of terrorism against a number of buildings and many travelers in Washington, D.C. The content of the calls demonstrates that the caller intended for them to provoke a significant, urgent response from law enforcement, which is what transpired. Union Station was evacuated at the end of a workday during the middle of the week; canine bomb sniffing units canvassed the entire building; and trains and other traffic were diverted, causing severe disruption to the public at large. The necessary law enforcement response to the calls was fraught with danger for the citizens of the District. Not knowing whether the threats were true, local and federal first responders appropriately responded with a sense of emergency. The hoax calls thereby placed in harm's way innocent citizens who were on the streets at the time of the calls, and diverted law enforcement resources during the hours it took for them to clear the scene from performing their critical mission of ensuring the safety of the citizens of the District.

### 2. *The Weight of the Evidence*

The weight of the government's evidence also favors detention. The government's case against Defendant is strong; it is supported by Defendant's telephone records, recordings of the crime itself (i.e., the audio of the 911 calls), and Defendant's multiple admissions.

### 3. *The History and Characteristics of the Defendant*

The history and characteristics of Defendant also favor detention. While the Court appreciates Defendant's ability to maintain employment in spite of his criminal history, the record before the Court is cause for concern. To start, as noted, Defendant has significant prior contact with law enforcement and a lengthy criminal record. His criminal history includes a litany of violent and nonviolent convictions across the United States, including a homicide conviction in Florida. He also has incurred six prior bench warrants, a Bail Reform Act conviction, and a prison breach conviction, all strongly indicating that he cannot be trusted to comply with court-ordered conditions of release. Further, as recently as this month, Defendant informed an FBI agent that he would meet with him at the FBI's Washington Field Office only to skip the appointment and avoid all the agent's subsequent attempts to contact him, in an effort to avoid arrest. Moreover, Defendant's lack of a fixed address and his admitted struggles with sobriety undercut any optimism the Court may have had that Defendant might comply with its release conditions.[1]

Based on the above, the Court does not trust that Defendant would honor whatever commitments it would impose were he to be released, and believes that Defendant would be likely to fail to reappear as required and to re-offend – if merely for his own entertainment – if he were released. This would place again the citizens of the District in danger. Therefore, the Court finds that defendant's history and characteristics favor his detention pending trial.

### 4. *The Danger to the Community*

The fourth factor, the danger to the community, also weighs in favor of detention. Defendant has admitted to a pattern of criminal behavior intended to provoke an emergency response from

---

[1] The government's proffer established that Defendant drinks alcohol and smokes marijuana. Pretrial Services has not drug tested Defendant recently, but, at the detention hearing, the Pretrial Services officer indicated that Defendant previously tested positive for cocaine.

law enforcement for his own entertainment. Based on his statements to law enforcement, it would appear that evidence of Defendant's impulse to place hoax 911 calls goes beyond the calls outlined in the government's detention memorandum, and includes at least one call reporting active gunmen in the McPherson Square Metro station. Defendant's desire to observe emergency responders rush to a reported crime scene and the flippancy with which he appears to view the impact these fabricated threats have on law enforcement and Washington, D.C. residents compels the Court to find that he presents a danger to the community. Given the ubiquity of telephones in our society, this Court also does not believe it can reasonably impose on Pretrial Services the obligation to keep Defendant away from all of them. Further, based on the entire record herein, even if the Court were to require as a condition of Defendant's release that he not use any telephone, the Court has no confidence that Defendant would comply with that requirement. On the other hand, Defendant's use of the D.C. Jail's telephones while detained can be monitored and his telephone calls will be recorded.

### IV.   CONCLUSION

Based upon consideration of all the evidence and the factors set forth in § 3142(g), of the statutory presumption applicable here, and of all less-restrictive alternatives to pretrial detention, this Court finds by clear and convincing evidence that no condition or combination of conditions exist that would reasonably assure the safety of the community. The Court also finds by a preponderance of the evidence that no condition or combination of conditions exist that would reasonably assure Defendant's appearance as required. Therefore, the government's motion for pretrial detention is granted.

Date:  December 27, 2016                                 _____
                                                                                        G. MICHAEL HARVEY
                                                                                        UNITED STATES MAGISTRATE JUDGE