UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JAMES CHERRY,<br><br>Defendant. | No. 16-cr-215-CKK |

## REPORT AND RECOMMENDATION

Following Mr. Cherry's violation of the terms of his supervised release, both Mr. Cherry and the U.S. Probation Office provided their positions on sentencing. *See* Def.'s Sentencing Memorandum ("Def.'s Memo"), ECF No. 55; *see also* U.S. Probation Office Sentencing Recommendation ("USPO Sent'g Rec."), ECF No. 53. For the reasons set forth herein, the undersigned recommends that Mr. Cherry receive a sentence of time served with no additional supervised release for his violation of the terms of his supervised release.[1]

## I.    BACKGROUND

On February 8, 2017, Mr. Cherry pled guilty to threatening and conveying false information concerning use of an explosive and aiding and abetting and causing an act to be done. *See* Plea Agreement 1, ECF No. 7. This conviction resulted in a sentence of thirty months' incarceration followed by thirty-six months of supervised release. *See* USPO Sent'g Rec. at 1.

On February 20, 2019, Mr. Cherry began his term of supervised release. *See* Def.'s Memo at 1. The period of supervision was originally set to expire on February 19, 2022. *See id.* However,

---

[1] Per the Probation Office, no hearing is needed to adopt this Recommendation, as no additional supervision is recommended.  Adoption of the Report and Recommendation would close this case.

the Probation Office filed subsequent probation petitions which extended his period of supervision. *See* ECF Nos. 28; 33; 42; 43; 50.

On February 12, 2021, the Probation Office filed a petition. *See* Probation Office Petition 1, ECF No. 43. This petition alleged a technical violation and that Mr. Cherry tested positive for cocaine. *See id.* On February 16, Judge Kollar-Kotelly issued a warrant for Mr. Cherry's arrest.

On February 20, 2025, law enforcement executed the arrest warrant and presented Mr. Cherry for a detention hearing. The Court released Mr. Cherry on conditions of release and ordered him to appear for a status hearing on February 26, 2025. As promised, Mr. Cherry appeared for that hearing. In turn, the Court set a status hearing for March 26, 2025.

On February 27, 2025, Judge Kollar-Kotelly referred this matter to the undersigned for a Report and Recommendation. *See* ECF No. 49.

On March 20, 2025, the Probation Office filed an updated petition. *See* Probation Office Petition ("Petition") 1, ECF No. 50. This petition alleged that Mr. Cherry tested positive for cocaine on two additional occasions and noted Mr. Cherry's admission to his cocaine use. *See* Petition at 3. On March 26, 2025, Mr. Cherry appeared before the undersigned. Mr. Cherry recommitted himself to his goals, including becoming sober. The Court set another status hearing for April 29, 2025. *See* Min. Entry for Apr. 29 (2025).

On April 21, 2025, the Probation Office notified the Court that Mr. Cherry had been attending outpatient treatment at MBI Health Services and that his urinalyses returned negative for controlled substances. *See* Probation Office Memorandum 2, ECF No. 52. At the April 29, 2025 status hearing, the Probation Office reported that Mr. Cherry's urinalyses continued to return negative results and that Mr. Cherry had begun to exhibit prosocial behavior. Mr. Cherry reported that he was gainfully employed with a towing company and proud to be maintaining his sobriety.

On August 27, 2025, the Court held a final revocation hearing. The Probation Office reported that Mr. Cherry continued to actively participate in drug treatment and that his treatment counselor noted positive progress. The Probation Office flagged that it could no longer fund Mr. Cherry's drug treatment due to budget constraints. The Probation Office was attempting to have Medicaid step in to fund continued treatment. Since the prior hearing, Mr. Cherry had relapsed once; however, Mr. Cherry was determined to continue with treatment, prioritize his sobriety, and secure new employment. On September 19, 2025, Mr. Cherry confirmed to the parties and this Court that he was continuing drug treatment via Medicaid.

Mr. Cherry has admitted the outstanding violations. The Probation Office and the government have recommended a sentence of seven months' incarceration with no term of supervised release to follow. *See* USPO Sent'g Rec., at 2. Mr. Cherry requested a sentence of time served with no term of supervised release to follow. *See* Def.'s Memo, at 7. Mr. Cherry argues that additional incarceration "is not needed to correct his breach of trust and works against his rehabilitation efforts" and would not "take into consideration the positive strides [he] made while on supervision." *Id.*

## II.    **DISCUSSION**

18 U.S.C. § 3583 governs the revocation of supervised release. Pursuant to § 3583, a court may "revoke a term of supervised release, and require the defendant to serve in prison all or part of the term of supervised release authorized by statute." 18 U.S.C. § 3583(e)(3). "[T]he length of [ ] supervision is dependent solely upon the defendant's need for supervision after release from jail." *United States v. Montenegro-Rojo*, 908 F.2d 425, 432 (9th Cir. 1990). In making this determination, a court considers the sentencing factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2)(B)–(D), and (a)(4)–(7). *See United States v. Byrd*, No. 21-cr-27, 2024 WL 3071088, at *3–

4 (D.D.C. June 4, 2024); *see also* 18 U.S.C. § 3583(e). These factors include: (1) the nature and circumstances of the offense and defendant's history and characteristics; (2) deterrence of criminal conduct; (3) protection of the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment; (5) the applicable sentencing guideline range for the offense and pertinent policy statements issued by the U.S. Sentencing Commission; (6) the need to avoid unwarranted sentencing disparities; and (7) the need to provide restitution to any victims of the offense. *See* 18 U.S.C. § 3553(a)(1), (a)(2)(B)–(D), and (a)(4)–(7).

Among the § 3553(a) factors the court should *not* consider in revocation determinations is "the need . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." *See* 18 U.S.C. §§ 3583(e), 3553(a)(2)(A). "The legislative history indicates that section 3553(a)(2)(A) was not included for consideration under 18 U.S.C. § 3583(c) because the primary purpose of supervised release is to facilitate the integration of offenders back into the community rather than punish them." U.S. Sent'g Comm'n, *Federal Offenders Sentenced to Supervised Release* (2010) ("Supervised Release Report") 9. Indeed, "[s]upervised release fulfills rehabilitative ends, distinct from those served by incarceration," *United States v. Johnson*, 529 U.S. 53, 59 (2000), and a "court shall impose a sentence sufficient, but not greater than necessary" to comply with the above-listed factors. 18 U.S.C. § 3553(a). Thus, when a "defendant violates a condition of supervised release, courts must consider the *forward-looking* sentencing ends, but may not consider the *backward-looking* purpose of retribution." *Esteras v. United States*, 606 U.S. 185, 186 (2025) (holding that a district court may not revoke supervised release based on a belief that the defendant's original sentence was lenient).

Here, the first § 3553 factor, Mr. Cherry's criminal history and characteristics, favors Mr. Cherry. Admittedly, Mr. Cherry's criminal history is lengthy. *See* Petition at 1. But it is dated. Mr. Cherry has not been arrested or convicted of any new offenses in the last five years. *See* Def.'s Memo at 4. Additionally, Mr. Cherry took responsibility for violating the conditions of his supervision and took the further step of admitting that he needed treatment. *See* Petition at 3. Mr. Cherry is making ongoing efforts to improve his mental health and undergo substance abuse treatment. *See* Def.'s Memo at 5. Moreover, although at the beginning of supervision Mr. Cherry was homeless, he overcame this obstacle by acquiring stable housing through the D.C. government. *See id.* And Mr. Cherry continues to work with a housing counselor to maintain this housing. *See id.* Besides the prior use of illicit substances—now being addressed by treatment—Mr. Cherry has otherwise substantially complied with the conditions of his supervised release. Mr. Cherry's recent history is the better reflection of who he is—not his mistakes of the past.

Factors two, three, and four—deterrence of criminal conduct, protection of the public from further crimes of the defendant, and the need to provide the defendant with educational or vocational training, medical care or other correctional treatment—favor Mr. Cherry. Regarding deterrence, Mr. Cherry has been successfully deterred. As stated above, he has not been arrested or convicted of any new offenses in five years. *See id.* at 4. That is the best evidence of why incarceration is not needed to deter criminal conduct. Indeed, "[t]here is no indication of how additional punishment furthers deterrence." *United States v. Nwenze*, No. 19-cr-285, 2024 WL 4608867, at *4 (D.D.C. Oct. 24, 2024). As to the provision of correctional treatment, further incarceration will not further that goal. Mr. Cherry is actively participating in substance abuse treatment in the community and has stable housing. *See* Def.'s Memo at 5. "[A]ny imprisonment .

. . could significantly interrupt or undo his [] progress." *United States v. Mosley*, 312 F. Supp. 3d 1289, 1294 (M.D. Ala. 2018).

Indeed, further incarceration endangers Mr. Cherry and the public. "Exposure to the specific and general harms that [] detainees experience can result in long-lasting trauma." *United States v. Bryant*, 778 F. Supp. 3d 14, 22 n.7 (D.D.C. 2025); *see also* Katie Rose Quandt & Alexi Jones, *Research Roundup: Incarceration can cause lasting damage to mental health*, PRISON POLICY INITIATIVE (May 13, 2021), at https://perma.cc/N6C2-8UWF (examining how experiencing or witnessing violence during incarceration was significantly related to "aggressive and antisocial behavioral tendencies as well as emotional distress."). Additionally, sending Mr. Cherry back to prison makes him 10 times more likely to be homeless again or in a precarious housing situation close to homelessness. *See* Lucius Couloute, *Nowhere to go: Homelessness among formerly incarcerated people*, PRISON POLICY INITIATIVE (Aug. 2018), at https://perma.cc/7U4N-2NV2. This is not only dehumanizing to Mr. Cherry, but also creates safety risks to him and the public. *See* David A. Sleet & Louis Hugo Francescutti, *Homelessness and Public Health: A Focus on Strategies and Solutions*, INT. J. OF ENV'T RSCH. AND PUB. HEALTH (Nov. 6, 2021), at https://perma.cc/JD6D-DQZW (discussing how homelessness is closely connected to declines in physical and mental health); Barbara Burton, David E. Pollio, & Carol S. North, *A longitudinal study of housing status and crime in a homeless population*, ANNALS OF CLINICAL PSYCHIATRY (Nov. 2018), at https://perma.cc/5MF2-MQ38 (studying the well-established correlation between homelessness and crime, noting that crime rates fell after subjects obtained housing). Further, Mr. Cherry is currently seeking employment. *See* Def.'s Memo at 6. Disrupting his search for gainful employment would again be counterproductive for him and the public. *See* Fredj Jawadi, Sushanta K. Mallick, Abdoulkarim Idi Cheffou, & Anish Augustine,

*Does higher unemployment lead to greater criminality? Revisiting the debate over the business cycle*, J. OF ECON. BEHAV. & ORG. (Feb. 2021), at https://perma.cc/FT5D-CZXB (finding that higher unemployment rates tend to increase crime and that "maintaining stable economic activity is critical in order to stabilize incidence of crime."). Indeed, even further supervision comes at a cost. "When the workforce is under mass supervision, key industries lose employee bargaining power" and "may be depressing wages and hurting working conditions for *all* workers in certain industries." Leah Wang & Wanda Bertram, *New data on formerly incarcerated people's employment reveal labor market injustices*, PRISON POLICY INITIATIVE (Feb. 8, 2022), at https://perma.cc/DS5V-BB4A. These harms undermine the goals of specific and general deterrence.

Ultimately, re-imprisoning Mr. Cherry would be especially harmful because he would necessarily have to spend time at the D.C. Jail.  "A recent audit of the D.C. Jail by the Office of the District of Columbia Auditor and Council for Court Excellence 'offers the most comprehensive review to date of facility operations, documenting a crisis marked by rising deaths, structural decay, staff shortages, and inadequate medical and behavioral health care.'" *United States v. Hodge*, No. 25-cr-204, 2026 WL 380543, at *2 (D.D.C. Feb. 11, 2026) (quoting Report by the Office of the District of Columbia Auditor and Council for Court Excellence (May 28, 2025)), at https://perma.cc/4SPB-XD9U. These problems are not limited to the D.C. Jail. *See United States v. Abass*, 779 F. Supp. 3d 1, 10 (D.D.C. 2025) (cataloguing problems plaguing jails). The unduly harsh conditions at detention facilities are an appropriate consideration for courts when considering detention. *See id.* (citing Benjamin Weiser, *Judge Refuses to Send Defendant in Drug Case to Troubled Brooklyn Jail*, N.Y. TIMES (Jan. 4, 2024), at https://perma.cc/Y2X6-V97J).

The Court cannot in good conscience send Mr. Cherry—a 66-year-old man—into these *deadly* conditions. Indeed, Mr. Cherry is particularly vulnerable to the harms of incarceration given his age: "older adults in prison are significantly more likely to experience disabilities, with cognitive impairments being twice as prevalent compared to their peers living in community settings." Anna Piil Damm & Cédric Gorinas, *Prison as a Criminal School: Peer Effects and Criminal Learning Behind Bars*, J. OF L. AND ECON. (2020), at https://perma.cc/3RAF-4VPK; Lindsey Culli, *Aging Behind Bars: Study Highlights Rising Disability Rates Among Older Adults in Prisons*, JOHNS HOPKINS DEP'T OF HEALTH POL'Y AND MGMT. (Jan. 14, 2025), at https://perma.cc/KD8G-TTBY.

Factor five, the applicable "guideline" range, cuts against Mr. Cherry. Chapter 7 of the Sentencing Guidelines sets forth advisory policy statements which the court may consider when imposing sanctions following a supervised release violation. *See* U.S.S.G. ch. 7, pt. A § 3(a). "Chapter 7 policy statements are not 'sentencing guidelines.'" *United States v. Blackston*, 940 F.2d 877, 893 (3d Cir. 1991). The Sentencing Commission chose to promulgate policy statements in lieu of guidelines to "provide[] greater flexibility" and "better opportunities for evaluation by the courts[.]" U.S.S.G. ch. 7, pt. A § 3(a). Thus, a court must "merely consider (i.e., reflect on, think about, deliberate, ponder or study) policy statements because Congress had not required adherence to policy statements[.]" *United States v. Kenny*, 846 F.3d 373, 376 (D.C. Cir. 2017) (internal quotations omitted).

To calculate the applicable range, the court first determines the grade of violation. Violations range from Grade A to C. S*ee* U.S.S.G. § 7B1.1. The grade of supervised release violation depends on the "conduct constituting" the violation. *Id.* Grade B and C violations "constitute less serious offenses" than Grade A violations. *[Redacted] v. [Redacted]*, 2022 WL

4546737, at *1 (D.D.C. Aug. 29, 2022). Here, the Probation Office alleges a Grade C violation, which Mr. Cherry admitted. *See* Petition at 2; *also generally* Def.'s Memo. Given Mr. Cherry's criminal history category, the applicable range of incarceration is 7 to 13 months. *See* U.S.S.G. § 7B1.4. A sentence of time served would be lower than the low end of this range, albeit only by seven months.

Here, the sixth and seventh factors—the need to avoid sentencing disparities and the need to provide restitution—are of limited relevance. There are no sentences to compare against co-defendants. However, the Court has supervised several defendants in a similar position as Mr. Cherry, all of whom received sentences of time served. *See, e.g.*, *United States v. Akers*, No. 11-cr-313, 2025 WL 2759274, at *1 (D.D.C. Sept. 29, 2025) (Judge Kollar-Kotelly imposing a sentence of time served); *United States v. Carpenter*, No. 16-cr-195, 2024 WL 4723211, at *1 (D.D.C. Nov. 8, 2024) (Judge Jackson similarly imposing a sentence of time served); *Nwenze*, 2024 WL 4810903, at *1 (Judge Cobb similarly imposing a sentence of time served). Judge Kollar-Kotelly suspended Mr. Cherry's restitution obligation, which moots this factor. *See* Petition at 3; Min. Entry (Jun. 10, 2019).

III.    **CONCLUSION**

What this case calls for is celebration of Mr. Cherry, not needless supervision seeking to punish him at everyone's expense.


Date: February 18, 2026

_____

ZIA M. FARUQUI
UNITED STATES MAGISTRATE JUDGE